Before I begin, Michael King for the appellant, I gather that the time for argument was moved up for the start of the calendar at 8 o'clock this morning. Unfortunately, there was a power outage at the Tukwila office yesterday afternoon with the windstorm. I didn't get that notice. I was here at 8.30. And I only mention this because I have a statement of additional authorities I was going to provide to the clerk at the start, and it wouldn't be disruptive if I may do that now. We'll get them after. And is the time on this case still 20 minutes aside? Yes, it is. OK. I'm going to try to save six. I know I need to keep track of that. May it please the court, my name's And I'm here on behalf of Ms. Sally Pickens, who's the plaintiff and appellant. This appeal arises out of the pretrial dismissal of Ms. Pickens' case for disability discrimination and related wrongdoing that was brought against her employer, the Social Security Administration. Now, the fundamental question in this appeal is whether Ms. Pickens' case should be reinstated. And today, I want to try and simplify the process of answering that question by focusing on two points, if I may briefly summarize them. Point number one is the contention that Ms. Pickens has a substantial claim for disability discrimination, independently based on facts arising before her April 1998 EEO complaint. The second point is that given a genuine issue of fact concerning whether Ms. Pickens was obligated to initiate an EEO complaint process within 45 days of Mr. Egan's November 21, 1997 memorandum, the pre-1998 facts would indisputably be in play, and the dismissal of her disability discrimination claim must be reversed and the case remanded for further proceedings. Now, the scope of that reverse a lot to prove broader, and I will try to get to some of those points during the course of my discussion. But at the very least, it's our contention, her disability discrimination claim based on the facts arising before April 1998, specifically the termination of her liberal leave accommodation, states a claim that is supported by substantial evidence that should go to a jury. And on that basis, at the very least, there should be a reversal. Now, turning to the first point, disability discrimination, and focusing on the termination of Ms. Pickens leave accommodation, the question we submit is whether a trier of fact could reasonably conclude, based on the evidence that is in the record before this court, the following three things. One, Ms. Pickens was disabled. Two, liberal leave was an appropriate accommodation of that disability. And three, terminating that accommodation violated her rights as a disabled person. And the answer is? Assuming she was disabled, or had a record of it, whatever, assume all those things. If I understand it correctly, the liberal leave accommodation comes down to this. There was a settlement that was reached between, as a result of the EO proceedings, to give Ms. Pickens six month get well period. There is no dispute that the Social Security Administration, as employer, told her at the end of that, you tell me if you need any more accommodation. She didn't. Her doctor's report said, everything is pretty good. She should be fine. And why doesn't that just end it? That brings us to the exhaustion of remedies point. No, it doesn't really. Well, it just brings it. I'm trying to put aside as much of the procedural stuff as I can and get right to the heart of it, which I've just articulated at least what I see as being the heart of it. Well, first, let me deal with the premise that the record supports that as a matter of law, you have to conclude that her doctors had said, everything is basically fine, and she's done with any need for leave accommodation at all. And that's as of November 1997. The record just doesn't support that and will not sustain that conclusion. Here's why. Well, her doctor indicated she could work a regular full time schedule. Your Honor, I must take issue with that reading of the record for two reasons. First of all, the government bangs away on this note from the doctor in September of 1997, which doesn't say that. It says things are improving, but it still refers to chronic conditions. Second, the testimony that was submitted by Ms. Pickens in opposition to summary judgment from her doctor, Gary Schuster, who revealed the entirety of the record, of her medical record, opined that this is a condition that's chronic, the irritable bowel syndrome, the gastrointestinal problems. And that condition is simply not ever going to be cured. Now, Your Honor referred to this six months period. The problem with the government's theory on that is simply this. The six months period referred to in the settlement agreement was talking about other conditions. The same settlement agreement has an absolutely unqualified acknowledgment by the government that the liberal leave accommodations, which were first granted in 1990 and reaffirmed in 1994, and those go to the question of the irritable bowel syndrome problem, the liberal leave accommodations were reaffirmed. The government acknowledged that there was a continuing need, and there's nothing in that agreement, in that clause, that says that's subject to reconsideration after six months. Now, Mr. Egan does testify in his declaration. He does say that the liberal leave accommodation was going to be subject to reconsideration after six months. Interestingly, his testimony in his declaration is what's contradicted by the documentary evidence. Now, he does write a memo to the file, November 21, 1997, which is supposed to be a memorialization of a conversation that takes place between him and Ms. Pickens earlier that month. And I agree that that memo has certain statements in it that someone might view reasonably as an assertion in that memo that in the conversation that took place earlier that month, Mr. Egan told Ms. Pickens, well, the six months period is up, and we are terminating the liberal leave accommodation. But the precise problem that's presented by that document is that it is nothing more than a memo to the file that purports to accurately represent what took place in an oral exchange at an earlier meeting between Ms. Pickens and Mr. Egan. Now, Ms. Pickens denies that that happened. Her testimony, and I refer the court specifically not just to her declaration, but to her deposition testimony, which, curiously, the government chose to make much of and inserted into the record. And it's ER pages 49 through 51. Her deposition testimony is very specific. She is describing this interchange and this process in this meeting. And she's making very clear that her understanding of the settlement agreement and her understanding of what was being discussed. Nobody is calling. If you notice, I didn't, in my proposition to you, didn't talk about understanding or construction of the settlement agreement. What is undisputed is that she was told that she could request leave accommodation at the end of the six months period and didn't. No. That's what I'm saying is disputed. Well, where? I mean, her uncommunicated subjective understanding of the settlement agreement, albeit contrary to her union representatives and everybody else's. But never mind that. Assume she understood it to mean that her leave would be continued. She was told she should say whether she needed accommodation. That's Mr. Egan's version of what happened in November. And it's unrefuted. It is refuted by her. There is no evidence from a union representative which is confirmatory of Mr. Egan's story about what took place in November 1987 in that meeting. He wrote a memo to the file. Now, this court's decision in the Boyd case says that you're under an obligation to initiate an EEO complaint when you are confronted with facts that would support a charge of discrimination that would have been apparent to a similarly situated person with a reasonably prudent regard for her rights. Ms. Pickens doesn't dispute that as of January 1998, she was confronted with the termination of her leave accommodation. Ms. Pickens disputes her testimony about what was discussed in November 1997, disputes that Mr. Egan told her that the liberal leave accommodation, which had been separately affirmed on an open-ended basis in the settlement agreement. I'm not talking about her silent, subjective impressions about the settlement agreement. I'm saying parsing the agreement as a contract. There's a numbered clause that says the government acknowledges that you're going to continue to get your liberal leave accommodations on the basis that have been previously granted. And there's nothing in there that says the six months. No, there's no tie-in to the six months. That's a separate clause in the contract. There is an argument to be made by the government. Certainly, I would not say that we're entitled to summary judgment on this basis. This is an issue of fact for a jury. There is an argument made by the government that the six months clause was intended to apply to everything, including the leave accommodation. Ms. Pickens' testimony is that's not true. And after all, she was a participant in the process of reaching a settlement agreement. She was present during the process of negotiation. And she has personal knowledge of the objective manifestations. This is not manifestations of intent and understanding. This is not like Aloha Air, where a witness is making assertions about things where she doesn't possibly have the personal knowledge about them. And she says that the six months period dealt with other conditions. What were the other conditions? She describes them. In 1995, when the government started to mess with her leave accommodation indirectly by piling on additional work demands and workload, by transferring more files to her, she became so stressed. This exacerbated her irritable bowel syndrome. But she became so stressed that she went into a state of depression. And her production declined. The six months period was a period designed so that she could work through those problems and balance and adjust. And that is her testimony. And that is her contention. And I submit that the documentary record is supportive of that position. At the very least, there is an issue of fact about whether, in truth, when Mr. Egan asserts that she was told at the end of the six months period, your liberal leave accommodation is up, and he writes a memo to the file that purports to memorialize accurately that interchange, there's an issue of fact about whether he actually told her that, whether that was actually the understanding, and whether a reasonably prudent person in her position, if she got the memo, would have thought anything more than, maybe I need to go talk to Mr. Egan, because there's some statements in here that are not consistent with what we talked about earlier this month. But to say, as a matter of law, that she was on notice, that the government was telling her, as of November 1997, that your leave accommodation is over and done with, no. Didn't this agreement, at the very least, give your client notice that the employer was saying, this position cannot be performed with a 50% attendance record when the 50% attendance comes at your whim and caprice? At the very least, isn't that? And if that is the message, then is your client qualified, with or without reasonable accommodation, to perform this act? And that's something that has to be established, right? Your Honor, I'd submit, actually, that the agreement on its face raises a question as to whether that contention of the government is sustainable. It's a matter of law, and it's really a jury question. Here's what the agreement says. If it's a matter of law, it isn't a jury question. I would agree with you, but we're extrapolating from the agreement. Your question was directed at the agreement. And the agreement says, this is ER 44, the first page of the agreement. Management recognizes the need to continue the liberal leave policy provided the complainant under a prior agreement. There was a prior agreement. It was informal in 1990. It was formalized in 1994. Now, Your Honor referred to that 50% attendance rate problem. Let's take that fact and accept it. 50% plus, it could just be determined that morning that she was going to be there or not be there or whatever. But the question then becomes, and now we really go back, you sort of loop back into the question of whether this accommodation is reasonable and indeed appropriate. The productivity evidence in the record, Ms. Pickens' declaration attaches this chart. The productivity evidence in the record shows that Ms. Pickens, with this 50% absence rate, meaning she's not sitting in her chair in the office 50% of the time, had no adverse impact on her productivity at all. She was working on, working through, and closing claim files at a production rate that was better than most of the people in her unit. Really, Your Honor, let me suggest that the question that you pose goes to what I think is the underlying premise of this new management team that came in in 1995 and started messing with these accommodations. It is the age-old image of the white-collar office that was evocatively portrayed by King Vidor and the crowd. It's the age-old notion that the white-collar office has to operate with people in their seats at 9 o'clock, only taking specified breaks, and not leaving until 5, that you have to be in your seat to do your job. We have moved away from that. The whole notion of disabled rights in this country is a recognition that what we should really be focusing on is what's necessary to do the job. The government has their own productivity measures in this case. The productivity measures used by the government demonstrate that this lady was very effective at her job. She didn't need to be in an office seat. She could do her work from home. Thank you. She could get the job done effectively. Is it your client's call that that's the nature of the job? Or does the employer have any right to be involved in this determination? Absolutely, they have a right to be involved in this determination. But remember, this is the unique case where the government has conceded on the record by its prior conduct, by an accommodation in 1990 reaffirmed in 1994, that Ms. Pickens was able to do the job. This is a very unique case. And we can argue from those facts, the inference, that when the government turned around and took away the leave accommodation, that this wasn't based on any actual evaluation of effectiveness. This was a reflection of a change in a management team, and unfortunately, the inner injection of prejudice against the disabled, and an insistence on an old-fashioned model of the white-collar office that just leads to the depression of the rights of the disabled. I understand your description of the old-fashioned model. You read one part of the settlement agreement. Unfortunately, I don't have it with me. There was another clause, the six-month clause. Yes. Do you want to read that? Yes. Let me see here. For the period beginning May 7th through November, complainant will continue to work with her physicians in a program designed to stabilize her medical condition. At the end of this period, management and complainant will review complainant's progress, and complainant will have the option of requesting reasonable accommodation and providing appropriate supporting medical documentation at this time. And she requested none. Because she felt she had worked through the other condition problem. She'd sorted out her depression, et cetera. I'll reserve the balance of my time. Thank you. Surely. Oops. Ms. Mitted. Good morning. May it please the court counsel, my name is Jamie Mitted. I'm an assistant United States attorney representing the government in this matter. Ms. Pickens has argued globally that she was discriminated against because of disability and that the agency failed to accommodate her. However, she has failed to actually tie her arguments into the EEO complaints that were actually at issue in this case. She hasn't specified exactly what evidence goes to which particular allegation that she's making. And in this case, there were three EEO complaints filed with the agency. And it is the government's position as we set forth in our brief that anything that occurred before November 12th of 1997, Judge Vlasnik correctly found that to the extent that Ms. Pickens is trying to raise a claim based on her prior supposed accommodation or that occurred before the settlement agreement, that it was not timely exhausted at the agency level. And let me focus a little bit on the settlement agreement and the discussion with her supervisor afterwards since your honors have raised this. The settlement agreement indicated clearly, and it's in the record and it speaks for itself, that it was expected that she would have a six month period to work with her physicians to attempt to get her physical condition into order. At the end of the six month period, it was expected that she would resume a regular full time work schedule. It was very clear that she was told that, and the settlement agreement says that if she had any further problems, that she could request an accommodation at that time as long as it was supported by proper medical documentation. At the end of the settlement agreement, she had a meeting with her supervisor and her union representative was present. And that was on November 12th. At that time, her supervisor told her that liberal leave was no longer an option and that she was expected to be at work on a regular full time basis. She was asked if she could do that. She agreed that she could. She indicated she was offered part time at the time. She indicated she did not want to work part time, that she could work full time, and that she expected that she would be able to continue working on a full time basis. Subsequently, Ms. Pickens has tried to say that she did not know that the liberal leave was no longer going to be an option. Her statement in and of itself, though, does not create a material factual dispute. The record is very clear. Her supervisor, Mr. Egan, memorialized the conversation in a memo dated November 21st. In addition to that, however, her own union representative has submitted in writing, when he was responding to a union grievance, he discussed the settlement agreement in that writing and indicated that the settlement agreement reinstated Ms. Pickens' liberal leave for a period of six months. And at the end of that six month period, it was fully expected that she would be able to work at a regular full time schedule and that she agreed that she could do so. That was her own union representative stating that, and that is on the record at ER 87. Also on the record at ER 224, Ms. Pickens' own brief in response to our motion for summary judgment indicated that Mr. Egan advised, and I'm summarizing, the words are not exactly like this, but it was Mr. Egan told Ms. Pickens at the November 12 meeting. And they indicated that it was in violation of the settlement agreement, but they do say he told her that liberal leave was no longer an option. So their own papers, their own pleadings before the court, have admitted that Ms. Pickens knew as of November 12 that liberal leave was no longer an option. To that extent, if she had a problem with that, if she believed that she should still be getting liberal leave, or if she believed she still had a need for some sort of accommodation, it was incumbent upon her, as the court well knows, within 45 days to file an EEO complaint saying something along the lines of, I've been discriminated against because my liberal leave has been taken away, or I believe I need an accommodation that I'm not getting. But she had 45 days to do that, and she didn't do it. So Judge Lasney correctly said that any claim, and a good part of Ms. Pickens' argument is focused on what went before November 12 and her belief that she was still entitled to liberal leave. And that clearly was not timely. That was cut off, rightly or wrongly, it was cut off in the government's position that it was very appropriate. But it was cut off as of November 12. So to the extent that she had a problem, she had to file within 45 days. Now, turning to the EEO complaints that are actually the basis for her district court complaint, the main focus and the main allegations throughout her complaints is basically that she's being discriminated against based on disability, and that the agency failed to accommodate her. Well, as the court well knows, obviously as a threshold matter, Ms. Pickens must establish that she's disabled under the Rehabilitation Act. And it's not enough for her to show that she has a medical condition or an impairment. And clearly, I mean, there is no dispute. She has had a lot of medical problems. But the fact that she has a medical problem doesn't mean that she's disabled. She has to show that the particular medical problem significantly impairs her in a major life activity. And her statements are not evidence. We have to look at the medical evidence that was available to the agency at the time that they were making the decisions that are at issue before the court. And there was no evidence ever presented to the agency from November 12, 1997 until Ms. Pickens was given a notice of proposal to remove. There was no evidence presented to the agency that Ms. Pickens was disabled in any way. The medical documentation that was on record is basically saying that she has some problems, but they're expected to be managed and that she can get over these problems, basically. So there's nothing before the court and before the agency showing that this woman was disabled. And I would like to walk through the EEO complaints that she actually filed and discuss the evidence or the lack of evidence pertaining to those complaints. Could you verify for me that she did file? She requested early retirement. But then about five days before then, at that point, she requested reasonable accommodation. Isn't that correct? In the last EEO complaint that she filed, which pertains to the fact that she was given a notice of proposal to remove her in August, she's indicated that that was discrimination based on disability and in retaliation for prior EEO complaints. And she also complains that the agency failed to accommodate her. Is there anything in the record to show why the Social Security Administration did not consider that request at that time? There is not, Your Honor. At the time that she was given the notice of proposal to remove, there was no evidence on the record for Social Security that she was disabled. So obviously, our argument would be that the proposal, even if you can assume that it's an adverse action, which we don't believe it is, but assuming for purposes of the motion that it is, there's nothing showing that she's disabled. So it can't be. They're not doing it because of a disability. But after the notice was given to her in August, she put in for an early out retirement that was being offered by the agency. She submitted her paperwork on September 1 with a retirement date listed for September 25. When she was given in August, actually August 27, the notice of proposed removal, she was told that she had 25 days to respond. Instead of responding to that initially, she put in for retirement, as I said, with an effective date of September 25.  responded to the notice to remove. And at that time, indicated that she would like to work at home, basically on a part-time basis, come to work sometimes, sometimes work at home. And she submitted an additional new doctor's report to support her claim. It's our position that that doctor's report, that Dr. Williams report, still doesn't show that she's disabled. But in any event, we had five days. And there is nothing on the record showing what happened in those five days. The fact of the matter is the agency didn't respond within the five days, and Ms. Pickens retired. It would be our position that her retirement mooted out the request for accommodation at that time. I would also argue that if they were going to consider it, you look at the doctor's note that she submitted at that point, and it still doesn't support that she's disabled. But in any event, the agency had five days. And Ms. Pickens was not in the office at this time. She was out on administrative leave. So it's our position that that was mooted out. Would the court like me to go through the earlier two EEO complaints? Or do you have any questions? I don't think so. OK, then I'll sit down. Thank you. Thank you. Mr. Key. Thank you. I want to start by addressing the union grievance document from May 1998. That's ER 87. When I said there was no evidence from her union representative, I said something too broad. Because there was this May 1998 document. And it does say, as a part of settlement of an EEO complaint, management reinstituted liberal leave usage by Sally for a six-month period, extending over a time in May through November 1997. So I agree that that statement in the record is consistent with the government's view of the settlement agreement. But it does not conclusively resolve this matter. Ms. Pickens' testimony is that the settlement agreement gave her continued leave for her chronic gastrointestinal condition and gave her six months to work out the management of her other problems. The agreement itself is ambiguous on this point. The agreement has a separate clause dealing with the reaffirmance of the leave accommodation. It is open-ended. It has no time frame. Ms. Pickens' description of the problems to be addressed by the six-month period is a reasonable description. If you want to get it at contract formation, it's a reasonable use of parole evidence to explain and elucidate. Now, at trial, counsel would perfectly be entitled to take this document from May 1998. It's not sworn by Mr. Allard, but take this document as part of the record and use it to impeach Ms. Pickens' recollection, just as Ms. Pickens' counsel will be entitled to take the actual terms and conditions of the agreement and impeach Mr. Egan's over-claim that the agreement establishes and that everybody understood that all of her medical conditions were to be treated as over and done with and worked out by November 1997. The fact is that the medical evidence that was before the government from the period 1990 through the spring of 1997 was that she had this chronic problem with the gastrointestinal system. It was something that required a liberal leave accommodation and that she was effective at her job with that accommodation. Now, Judge Nelson asked about the back end of this process, 1999, and I think you got an important concession from the government. There was an acknowledgment after saying, no medical evidence, no medical evidence, no medical evidence, that in fact, there was medical evidence submitted in support of that request. But what you are told is, well, that was all mooted because Ms. Pickens then took early retirement. Yes. She'd been presented with this Scilla and Charybdis choice. You either take early retirement and maintain some of your benefits or you're fired, in which case you're going to lose your medical and a number of other things. I submit that that kind of take it or leave it option doesn't moot the problem. It just means that we've got evidence in the record of a request for an accommodation that the government avoided dealing with by creating a circumstance that amounts to a constructive discharge. That was no free choice involved at all. Your Honors, you have an issue of fact on disability discrimination. The EEO complaint from 1998 ties into the termination of leave accommodation. Mr. Egan has his story about the events, but the record does not establish that as a matter of law, his claims in that November 1997 memo can be credited as legally dispositive of this factual dispute. And on that basis, at the very least, the case should be reversed and remanded for further proceedings. Thank you. Thank you, Mr. Egan. Thank you. Thank you, counsel. The matter just argued will be submitted.
judges: Nelson, Rymer, Beam